UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| - against - | Civil Action No. 2:23-cv-01648 |
| ADAM S. KAPLAN and DANIEL E. KAPLAN, | COMPLAINT |
| Defendants. | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC" or "Commission"), for its Complaint against defendants Adam Kaplan and Daniel Kaplan (together, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1. Defendants are identical twin brothers who engaged in several different fraudulent activities to misappropriate more than $5 million from at least 60 of their investment advisory clients.

2. Defendants were associated as investment adviser representatives with an SEC-registered investment adviser from May 2018 until their termination in July 2021, and after leaving that firm, they continued to act as investment advisers to certain clients.

3. Among other things, from at least May 2018 through July 2021, Defendants overcharged clients for advisory fees by fraudulently inflating the fee amounts in clients' advisory agreements, without the clients' knowledge or consent, so that they could collect higher fees than their clients had agreed to pay.

4. In addition, from at least May 2018 through at least October 2022, Defendants misappropriated clients' funds by fraudulently applying charges to their clients' credit card and bank accounts for, among other things, purported investments or additional advisory fees to which Defendants were not entitled.

5. Defendants used the clients' funds obtained from these fraudulent activities for their personal benefit and to repay certain clients who complained about unusual account activity.

6. Defendants also made misrepresentations, falsified documents, and made Ponzi-like payments to clients to conceal their fraudulent activities.

7. By engaging in the conduct described herein, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5, thereunder [17 C.F.R. § 240.10b-5] and Section 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2)].

8. Defendants will continue to violate the federal securities laws unless restrained or enjoined by this Court.

9. The SEC therefore seeks a judgment against Defendants providing permanent injunctive relief; disgorgement of ill-gotten gains pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), (7)]; imposing civil monetary penalties, pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. 80b-9(e)]; as well as other appropriate and necessary relief.

**JURISDICTION AND VENUE**

10. The Commission brings this action pursuant to the authority conferred by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

11. This Court has jurisdiction over this action pursuant to Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u, 78aa] and Sections 209(d) and 214(a) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-14(a)].

12. In connection with the conduct alleged in this Complaint, Defendants directly or indirectly made use of the means or instruments of transportation and communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange.

13. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214(a) of the Advisers Act [15 U.S.C. 80b-14(a)]. Acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Eastern District of New York. In addition, Defendants reside in this district.

## DEFENDANTS

14. **Adam S. Kaplan,** age 35, is a resident of Great Neck, New York and Miami Beach, Florida. From May 2018 through July 2021, he was associated as an investment adviser representative with Firm A, an SEC-registered investment adviser. He is not currently associated with any SEC-registered investment adviser.

15. **Daniel E. Kaplan,** age 35, is a resident of Great Neck, New York and Miami Beach, Florida. From May 2018 through July 2021, he was associated as an investment adviser representative with Firm A, an SEC-registered investment adviser. He is not currently associated with any SEC-registered investment adviser.

**FACTUAL ALLEGATIONS**

I. **Background**

16. From 2016 to July 2021, Defendants worked as investment adviser representatives for several different SEC-registered investment advisers. Over time, Defendants grew their client base to approximately 277 clients. Many of Defendants' clients were their family, friends, and neighbors. Because of their relationships, and because some of the clients were unsophisticated in financial matters, they placed significant trust in Defendants. Many clients followed Defendants as they moved from firm to firm.

17. In May of 2018, Defendants became associated with Firm A as investment adviser representatives. Firm A is an SEC-registered investment adviser incorporated in Illinois with a principal place of business in Chicago, Illinois.

18. Although Firm A was based in Illinois, Defendants worked out of New York. Defendants held themselves out as "New York Directors" of Firm A. Defendants told some of their clients they were operating their own firm, as opposed to working as investment adviser representatives for Firm A.

19. During the time they worked for Firm A, Defendants made investment-related recommendations to their clients; had discretion, including trading authority, over clients' accounts; ordered trades; and generally managed their clients' investment portfolios.

20. Defendants served as co-investment advisory representatives to their clients while they worked at Firm A. They worked together to service their clients' accounts. Their clients had access to both Defendants, and, although some clients preferred either Adam or Daniel, either brother could assist clients with investment advice, transferring funds, or ordering trades.

21. At Defendants' request, many of Defendants' clients provided Defendants with access credentials to the accounts at brokerage firms where the clients' advisory accounts were custodied ("Custodial Accounts"), access credentials to their personal bank accounts, and/or their personal credit card information.

22. In July of 2021, Firm A terminated Defendants. Firm A terminated Defendants after receiving a complaint from one of Defendants' clients alleging misconduct, including allegations that Defendants overcharged this client advisory fees.

23. After Firm A terminated Defendants, Defendants continued to act as investment advisers to some of their clients. For these clients, Defendants continued to access the clients' Custodial Accounts.

24. As investment adviser representatives and investment advisers, Adam Kaplan and Daniel Kaplan owed their clients an affirmative duty of utmost good faith.

25. In violation of those duties, from at least May 2018 to at least October of 2022, Defendants engaged in the fraudulent conduct described below.

## II. Defendants' Fraudulent Overbilling of Advisory Fees

26. While they were associated with Firm A, from May 2018 through July 2021, Defendants caused at least 54 clients to be fraudulently overbilled by Firm A for at least $540,000 in advisory fees.

27. During the time they worked for Firm A, Firm A charged Defendants' clients an advisory fee. The fee was based on a percentage of the clients' assets under management. The fee was billed to the clients by Firm A on a quarterly basis, and taken directly from the clients' Custodial Accounts.

28. The amount of this fee was set forth in a written agreement between the client and Firm A (the "Advisory Agreement"). The Advisory Agreements for Defendants' clients were signed by the client and by Adam Kaplan. Defendants electronically submitted signed, final versions of the Advisory Agreements to Firm A, which were loaded to an internet-based database to which Defendants had access.

29. Firm A paid 82-88% of the advisory fees collected from Defendants' clients to Defendants, and Firm A kept the remaining 12-18%.

30. In order to perpetrate this aspect of their fraudulent scheme, Defendants orally agreed with clients to charge a certain advisory fee, typically 1% or less. Defendants also orally agreed to charge several clients 0%, either on a temporary basis as an introductory fee, or due to a personal relationship. However, Defendants fraudulently caused these clients to pay higher advisory fees – ranging from 1.25% to 2.95%.

31. Defendants fraudulently inflated the fee amounts in clients' Advisory Agreements, after the clients signed them, including in the ways described below.

32. Typically, Defendants would provide clients an Advisory Agreement for their signature with the fee amount section either left blank or not included at all. Then, after the clients signed the Advisory Agreements, Defendants would insert advisory fees that were higher than what the clients had orally agreed to. This caused Firm A to charge clients higher, fraudulently inflated amounts.

33. For example, in or around September 2019, Adam Kaplan and Client A orally agreed to a 1% advisory fee. Later, Adam Kaplan sent Client A a blank Advisory Agreement on or around September 16, 2019, and instructed Client A to sign it. Client A returned the Advisory Agreement with her signature, and the fee amount still blank. In the version of Client A's

6

Advisory Agreement that they provided to Firm A, however, Defendants added in the fee election section of the form a fee of 2.88%. As a result, Firm A charged Client A a 2.88% advisory fee, instead of the agreed upon 1%.

34. As another example, in or around September 2018, and again in or around December 2019, Daniel Kaplan instructed Client B to sign Advisory Agreements with the fee sections left blank. He told Client B that her fee would be 1%. However, the versions of Client B's Advisory Agreements that Defendants provided to Firm A listed fees of 2% and 2.8%.

35. In some cases, Defendants included an agreed-upon fee in the Advisory Agreements they asked their clients to sign, but then fraudulently altered that percentage after the client signed the Agreement.

36. In or around February 2021, for instance, one of the Defendants' advisory clients, Client C, signed an Advisory Agreement that included a fee of 1%. After both Client C and Adam Kaplan signed the Agreement, one of the Defendants changed the fee from 1% to 2.94%.

37. For some clients, Defendants fraudulently increased their advisory fees over time using amendments to their Advisory Agreements. Defendants asked clients to sign amendments to their original Advisory Agreements which did not include fee amounts, and Defendants later filled in higher advisory fee amounts to which the clients had never agreed.

### III. Defendants' Misappropriation of Client Funds

38. In addition, from at least May 2018 through at least October 2022, Defendants misappropriated at least $4.5 million from clients through various fraudulent devices, as described below.

39. Defendants used the funds they misappropriated for their personal benefits – including charges at luxury hotels, jewelry stores, and luxury apparel companies – and to make Ponzi-like payments to other clients who complained about Defendants' misconduct.

### A. Defendants' Fraudulent Charges to Clients' Accounts Through Electronic Payment Accounts

40. Defendants each opened several accounts at payment processing companies, such as Intuit, Block, Inc. (f/k/a Square), Venmo, Zelle, and PayPal (collectively, "electronic payment accounts"). Defendants used these electronic payment accounts, and the personal financial account information their clients had given them, to misappropriate their clients' funds, including by using one or more of the devices described below.

41. In total, from at least May of 2018 through at least October of 2022, Defendants misappropriated at least $4 million from clients through the electronic charges they fraudulently applied to clients' credit card and bank accounts. Adam Kaplan charged clients at least $2.94 million, and Daniel Kaplan charged clients at least $1.11 million.

#### 1. *Fraudulent Advisory Fee Charges*

42. Defendants used their electronic payment accounts, and the credit card and/or bank account information clients had given them, to fraudulently charge many of their clients' credit cards and/or bank accounts for investment advisory fees purportedly owed by the clients to Defendants.

43. Defendants told some of these clients that the charges were investment advisory fees that they owed Defendants. However, Defendants knew that Firm A was charging the clients for their advisory fees, that Firm A was paying Defendants the majority of those fees, and that the clients did not separately owe Defendants any additional fees.

44. For example, when Client A began noticing transactions debited from her bank account with the note, "Kaplan Sale," she called Adam Kaplan to question these charges. Adam Kaplan falsely told Client A that these charges were for her advisory fee. Client A did not understand at the time that Firm A was charging an advisory fee to her Custodial Account for the Defendants' investment adviser services.

45. As another example, Daniel Kaplan told Client B that her advisory fee would be billed monthly to her credit card. Client B did not understand that Firm A was already charging an advisory fee to her Custodial Accounts for the Defendants' investment advisory services.

46. After Defendants were terminated by Firm A, they continued charging some clients for whom they continued to act as investment advisers purported advisory fees by charging the fees to the clients' credit cards or bank accounts. These purported fees exceeded the previously agreed-upon amounts for clients' Firm A accounts. Defendants' clients did not understand that they were being charged excessive fees.

### 2. *Fraudulent Charges for Purported Investments*

47. Defendants used some clients' bank and credit card information to fraudulently charge them for purported investments, including purported investments in stock, that Defendants falsely claimed they would make on the clients' behalf.

48. Defendants told some of these clients they would charge them a pre-set amount at regular intervals and then use the money they collected to invest on the clients' behalf.

49. Defendants told some of these clients that Defendants would pool their money into an "umbrella account" with other clients' funds, invest the funds in securities, and later deposit the clients' pro rata share of the securities purchased into the clients' Custodial Account.

50. These representations were false. Defendants did not use these client funds to invest in securities for their clients. They did not maintain an "umbrella account." Instead, Defendants transferred these funds to their own personal bank accounts and used them for their personal use.

51. For instance, Adam Kaplan told Client D that Defendants would transfer money regularly from Client D's checking account to Client D's Custodial Account to invest the funds in securities. When Client D noticed that her Custodial Account contained substantially less than it should, considering all the debits from her checking account, she called Adam Kaplan on the telephone. Adam Kaplan told Client D that her funds were held in a collective account at Firm A, and would be invested for her benefit. This representation was false. In reality, Adam Kaplan had misappropriated Client D's funds for his own benefit.

### 3. *Fraudulent Offsetting Transfers from Clients' Custodial Accounts*

52. Defendants used their access to certain client accounts to initiate fraudulent cash transfers out of clients' Custodial Accounts, into the clients' bank accounts, in order to fraudulently obtain funds from the clients through fraudulent electronic charges.

53. To perpetrate this aspect of their fraud, simultaneous to initiating a cash transfer out of the Custodial Account, Defendants initiated an electronic charge to the client's bank account, in an amount close or equal to the cash transfer out of the Custodial account. The funds from the electronic charges were then transferred out of the client's bank account and deposited into the Defendants' personal bank accounts.

54. By structuring the transactions this way, Defendants obscured their misappropriation from their clients. The clients did not understand that Defendants were transferring money from the clients' own brokerage accounts and then using the funds to pay

10

themselves. Defendants told at least some clients that the funds Defendants transferred into the clients' bank accounts were from one of the Defendants' own personal brokerage accounts.

55. On at least three occasions, Defendants sold securities that a client held in his or her Custodial Account in order to fund the transfer to the client's bank account that was fraudulently paid to Defendants for their own benefit.

### 4. *Fraudulent Offsetting Transfers from Clients' Lines of Credit*

56. Defendants advised several of their advisory clients to open and maintain lines of credit ("LOCs") at a certain bank. The LOCs were collateralized by the clients' Custodial Accounts in which they held securities purchased through Firm A.

57. The clients granted Defendants access to their LOCs during the account opening process, and Defendants had the ability to request draws on the LOCs on behalf of the clients. The clients' bank accounts were linked to the LOCs. This allowed Defendants to request draws on the LOCs to be transmitted to the linked client bank account on file.

58. To misappropriate certain clients' funds, Defendants requested draws on the client's LOC, transferred the proceeds to that client's bank account, simultaneously initiated a fraudulent electronic debit, credit, or check charge to the client's bank account through an electronic payment account, and then used the clients' funds for their own benefit.

59. These clients were not aware that Defendants were using these funds for their own benefit. At least some clients were not aware that Defendants were drawing on their LOCs in the first place.

### B. Misappropriation from Clients' Lines of Credit

60. As mentioned above, Defendants advised several of their advisory clients to open and maintain LOCs. Defendants misappropriated funds from these accounts in several ways.

11

61. First, Defendants falsely represented to at least two advisory clients that they would arrange interest-bearing loans from the client's LOC to other clients. Defendants claimed these clients would benefit from interest payments. In reality, Defendants did not arrange loans, and instead used the funds for their own benefit, or for Ponzi-like payments to complaining clients.

62. For example, between approximately December 2020 and June 2021, Adam Kaplan initiated at least 13 wires totaling approximately $234,000 from the LOC belonging to one of Defendants' advisory clients, Client E, to various individuals. Adam Kaplan falsely told Client E that these wires were for interest bearing loans he had arranged for Client E's benefit. Client E never received the principal or interest payments for any of these purported loans.

63. Second, between approximately February 2021 and April 2021, Adam Kaplan initiated at least four unauthorized wires out of Client E's line of credit account, including approximately $68,000 to a designer handbag retailer for a handbag, $58,000 to a high-end watch retailer, and $30,000 to a match-making service. Adam Kaplan advised Client E to approve these wires under the pretense that these were also interest bearing loans to other individuals, without disclosing that they were for the above-described personal goods and services. These unauthorized wires totaled over $156,000.

### C. Fraudulent Check Alteration

64. Daniel Kaplan misappropriated funds from one of Defendants' advisory clients by altering checks. Client F wrote four checks payable to Daniel Kaplan, which Daniel was to use for home repair projects for Client F's elderly mother. Before Daniel Kaplan deposited the checks, he changed the amounts written on the checks and kept the proceeds, thereby misappropriating over $36,000.

## VI.     Defendants' Steps to Cover Up Their Fraud and Misappropriation

65.     In order to cover up their fraud and misappropriation, Defendants made additional misrepresentations to their clients and others, including in the ways described below.

66.     ***First***, Defendants created fictitious Consulting Agreements purportedly signed by clients that they provided to the clients' credit card companies and banks to justify the amounts they had charged the clients and conceal their misappropriation. The Consulting Agreements showed a made-up project Defendants had purportedly worked on for the client, an amount of time purportedly spent, and a total amount purportedly owed to Defendants by the client. Defendants knew that the information on the Consulting Agreements was false. The clients were not aware of the Consulting Agreements, did not sign them, and had not hired Defendants for consulting work.

67.     In one such instance, Defendants submitted several invoices to Client A's bank for purported consulting work provided in February and April of 2021 for Insurance Planning, Risk Planning, Risk Management, Loan Consultations and Life Coaching at a rate of $500/hour. Client A never hired Defendants as consultants, never signed the invoices, and never agreed to the hourly rate listed. Client A only ever hired Defendants as her investment advisers.

68.     ***Second***, Defendants made Ponzi-like payments to clients using misappropriated funds from other clients, in order to perpetuate their fraud. When some clients complained, Adam Kaplan repaid them with funds that included other clients' money.

69.     For instance, as described above, Adam Kaplan used false pretenses to initiate wires from Client D's line of credit to other individuals. Some of these funds were payments to other clients who also had outstanding loans or other payments due from Defendants.

13

70. In total, Defendants used at least $3 million to repay at least 12 clients, using funds that came in part from other victims of Defendants' fraud.

71. *Third*, Defendants concealed their misappropriation from several clients by linking the clients' Custodial Accounts using a tool called "inquiry access." This meant that when these clients accessed their Custodial Account on-line, the balance they saw reflected the total balance of several of Defendants' clients' linked accounts. The clients were unaware that Defendants had linked their accounts, and that they did not control the full amount of funds they saw in their account balance.

72. *Fourth*, at least twice, Defendants falsely changed the address of record for a client's correspondence with their financial institution in order to hide their fraud.

73. For example, Client A opened a LOC upon Adam Kaplan's advice. Adam Kaplan changed the address of record for Client A at the financial institution that had issued her LOC. Client A's line of credit was one of the accounts Defendants used to misappropriate funds, as described above. Thereby, Adam Kaplan attempted to hide from Client A her statements or any correspondence regarding her line of credit, which would have alerted Client A to his misappropriation.

## CLAIMS FOR RELIEF

### COUNT I

*Against Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

74. The Commission realleges and incorporates by reference paragraphs 1 through 73 as if fully set forth herein.

75. Defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce or the mails, directly and indirectly: (a)

14

used and employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon other persons, including current and prospective clients.

76. Defendants knowingly or recklessly engaged in the fraudulent conduct described above.

77. By engaging in the conduct described above, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### *Against Defendants for Violations of Section 206(1) and 206(2) of the Advisers Act*

78. The Commission realleges and incorporates by reference paragraphs 1 through 73 as if fully set forth herein.

79. Defendants, while acting as investment advisers, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly and indirectly: (a) employed devices, schemes, or artifices to defraud clients and prospective clients; and (b) engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon clients and prospective clients.

80. Defendants knowingly or recklessly engaged in the conduct described above.

81. By engaging in the conduct described above, Defendants have violated, and, unless restrained and enjoined, will in the future to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

15

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court enter a Final Judgment:

(A)  Finding that Defendants violated the securities laws and rules promulgated thereunder as alleged against herein;

(B)  Permanently restraining and enjoining Defendants, their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of the Order, and each of them from, directly or indirectly, engaging in the acts, practices or courses of business alleged above, or in conduct of similar purport and object, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5] and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

(C)  Permanently restraining and enjoining Defendants from, directly or indirectly, including, but not limited to, through any entity owned or controlled by Adam Kaplan and/or Daniel Kaplan, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Defendants from purchasing or selling securities with their own personal assets for their own personal accounts;

(D)  Ordering Defendants to disgorge the ill-gotten gains that they received, directly or indirectly, from the violations alleged herein, including prejudgment interest

pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), (7)];

(E) Ordering Defendants to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(3)];

(F) Retaining jurisdiction over this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

(G) Granting such other relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury on all issues so triable.

March 3, 2023

Respectfully submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

 /s/ Alyssa A. Qualls
Alyssa A. Qualls (AQ-4247)
Ariella Omholt Guardi, IL Bar No. 6297336 (*pro hac vice application forthcoming*)
BeLinda I. Mathie, IL Bar No. 6275461 (*pro hac vice application forthcoming*)
Marlene B. Key-Patterson, IL Bar No. 6296919 (*pro hac vice application forthcoming*)
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (FAX)

17

quallsa@sec.gov
guardia@sec.gov
mathieb@sec.gov
keym@sec.gov

*Attorneys for Plaintiff*
*U.S. Securities and Exchange Commission*